## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **GIANNA LATORRE,** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| **ROCK GATE CAPITAL, LLC d/b/a** | ) | |
| **160 DRIVING ACADEMY** and | ) | **JURY DEMAND** |
| **TRUCKER'S NETWORK**, an Illinois | ) | |
| Corporation, and **STEVE GOLD**, individually | ) | |
| in his personal capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Gianna Latorre ("Ms. Latorre" or "Plaintiff"), by the undersigned attorneys, complains against Defendants Steve Gold ("Gold") and Rock Gate Capital, LLC d/b/a 160 Driving Academy and Trucker's Network ("Defendant" or "Rock Gate") (collectively, "Defendants"), individually for violations of the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*) ("FLSA"), Family and Medical Leave Act (29 U.S.C. § 201 *et seq.*) ("FMLA"), Equal Pay Act (29 U.S.C. § 206(d) ("EPA")), and quantum meruit as follows.

## NATURE OF THE ACTION

1.      Defendants failed to pay Plaintiff overtime wages and commission payments, in addition to retaliating against her due to taking leave protected by the FMLA.

2.      Plaintiff seeks to recover damages for unpaid wages, compensatory, liquidated, and punitive damages, attorneys' fees, costs and any other relief deemed just, proper, and equitable.

## PARTIES

3.     Plaintiff Gianna Latorre was at all relevant times a citizen of the State of Arizona. Plaintiff has been employed by Defendants since January 2022.  Plaintiff worked remotely for Defendants from her home in Arizona.

4.     Defendants were employers during the relevant time period, as defined by the FLSA, 29 U.S.C. §203(e)(1).

5.     Defendant Rock Gate Capital, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois 60604 and is a citizen of the State of Illinois.

6.     Defendant Rock Gate Capital, LLC is an enterprise engaged in commerce or in the production of goods for commerce, with annual gross sales of at least $500,000, within the meaning of 29 U.S.C. § 203(s).

7.     Defendant Steve Gold is a natural person who, on information and belief, resides in Evanston, Illinois.

8.     Gold is, and at all relevant times was, the Chief Executive Officer ("CEO") of Rock Gate Capital, LLC and has complete control over Plaintiff's conditions of employment and authority to make decisions concerning the Enrollment Specialist position (and similar positions with varying names), including hiring, firing, wages, and other terms and conditions, including with respect to Plaintiff specifically. Gold controlled the commission and method of payment for Enrollment Specialists like Plaintiff, had the authority to hire and fire Plaintiff and all others in her position simultaneously, and generally had operational control over Plaintiff's functions, which were integral to the ongoing viability of the company.

## JURISDICTION

9.      The Court has federal question jurisdiction by way of the FLSA, 29 U.S.C. § 201 *et seq.*, FMLA, 29 U.S.C. § 201 *et seq.*, EPA, 29 U.S.C. § 206(d), and pursuant to 28 U.S.C. § 1331.

10.     The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff is a citizen of Arizona, Defendants are citizens of Illinois, and the amount in controversy exceeds $75,000.

11.     The Court has supplemental jurisdiction over Plaintiff's State law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants reside in this District and its principal places of business is in this judicial District.

## FACTS COMMON TO ALL COUNTS

### ROCK GATE CAPITAL D/B/A 160 DRIVING ACADEMY AND TRUCKER'S NETWORK

13.     Defendant Rock Gate Capital, LLC operates 160 Driving Academy, a school that provides truck driver training classes at over one hundred locations nationwide.

14.     Rock Gate Capital, LLC is owned and operated by Defendant Steve Gold, who acts as its Chief Executive Officer ("CEO").

15.     During the relevant time period, Defendants employed Call Center Representatives, Enrollment Specialists, and Enrollment Counselors like Plaintiff for purposes of making calls to potential students and attempting to sell them Defendants' courses.

16.     The name of this role changed over time, as did payment terms, commissions, and the general incentive for maintaining such a position.

17.     Plaintiff's role was structured and marketed as a sales role. Unfortunately, Plaintiff would learn that it was a bait-and-switch intended to steal cheap labor and shortchange employees.

### PLAINTIFF'S EMPLOYMENT

18.     Plaintiff began working for Defendants as a Call Center Representative making $18.50 per hour plus commission on or about January 12, 2022.

19.     Soon thereafter, Plaintiff's title changed to Enrollment Counselor and subsequently to Enrollment Specialist.

20.     At all relevant times, Plaintiff worked remotely for Defendants and her duties remained the same.

21.     Plaintiff's primary duty was to call potential students and enroll them in 160 Driving Academy courses.

22.     During the relevant time period, Plaintiff was not a manager, did not have supervisory authority over any employees, did not possess the authority to hire or fire employees, did not direct the work of two or more employees, and did not exercise discretion and independent judgment with respect to matters of significance.

23.     Plaintiff's primary duty was not the management of the enterprise.

24.     A majority of Plaintiff's work is on the phone with customers, taking notes and maintaining client lists, and other related planning work away from electronic systems.

25.     When Plaintiff got close to 40 hours, her supervisor, Tim Bandsma, directed Plaintiff to clock out and complete her work off the clock.

26.     Plaintiff worked on average 5-10 hours of overtime per week.

27.     Much of this work is not captured in electronic systems, such as Ring Central, Sales Force, or e-mail.

**PLAINTIFF'S SHIFTING COMMISSION STRUCTURE**

28.     Plaintiff initially earned a varying commission rate for all enrollments made after 25 per month  (the "Original Commission Plan"). *See* Exhibit A.

29.     On January 17, 2024, Rock Gate revised the Commission Plan to create the First Amended Commission Plan, a copy of which is attached hereto as Exhibit B.

30.     Pursuant to the First Amended Commission Plan, Plaintiff earned $200 per enrollment, for every enrollment, with no cap.

31.     Pursuant to the First Amended Commission Plan, Plaintiff's commission was earned regardless of whether the student remained enrolled in, or graduated from, the program.

32.     Plaintiff received positive performance evaluations throughout her tenure.

33.     On July 12, 2024, Kevin Murphy ("Murphy"), Rock Gate's Chief Operating Officer, told Plaintiff and other Enrollment Specialists that they were to begin enrolling "Amazon Career Choice" students, which were drivers employed by Amazon.

34.     Murphy confirmed in writing that the $200 commission applied to Amazon Career Choice enrollments.

35.     Pursuant to the First Amended Commission Plan, Plaintiff's title was converted to "Enrollment Counselor" and "[f]or each month, the number of students you enroll will pay out $200 per enrollment[,]" without further qualification. The Plan goes on to state in bold: **There is no cap to your earnings each month.** *Id.*

**DEFENDANTS RETALIATE AGAINST PLAINTIFF FOR TAKING FMLA LEAVE**

36.     Plaintiff requested and was approved for intermittent FMLA leave in October 2023 due to the need to address panic attacks.

37.     Plaintiff's supervisor, Bandsman, indicated her leave was approved in the form of intermittent leave from work as necessary.

38.     Plaintiff informed her supervisor in each instance and used the accommodation sparingly.

39.     In or about November 2024, Plaintiff sought to apply for a higher paying business development position within the company.

40.     Bandsman asked Plaintiff if she were interested in a management role in Tacoma.

41.     Bandsman indicated that Plaintiff could not transfer to a higher paying job "if the intermittent FMLA would continue to be a problem."

42.     Thereafter, Bandsman refused to consider Plaintiff for any other position in which she would earn more money, a raise, or any other meaningful added benefit or promotion.

43.     Plaintiff experienced this conduct at the hands of her supervisors and others at the express direction of Steve Gold.

### DEFENDANTS' REFUSAL TO PAY PLAINTIFF'S COMMISSIONS

44.     Beginning in August 2024, Defendants stopped paying Plaintiff and other Enrollment Specialists $200 commissions for Amazon Career Choice enrollments.

45.     Plaintiff began asking questions regarding the commissions she earned and when she would be paid.

46.     Plaintiff asked for a summary of her commissions from her supervisor multiple times, and each request was met with a refusal.

47.     During those two months alone, Plaintiff earned thousands of dollars in commissions.

48.     Instead of paying Plaintiff and other Enrollment Specialists, Defendants presented another amended Commission Plan in October 2024 (the "Second Amended Commission Plan") and insisted that it would be applied retroactively to commissions already earned pursuant to the First Amended Commission Plan in August and September 2024. *See* Exhibit C. This Second Amended Commission Plan was not signed by Plaintiff until October 24, 2024.

49.     Defendants did not pay Plaintiff for all Amazon commissions earned in August, September, and October 2024, and potentially more.

50.     After requesting payment for months, Plaintiff eventually separated from Defendants on January 15, 2025.

## CLAIMS FOR RELIEF

### COUNT I
**Breach of Contract**
**against Defendant Rock Gate Capital, LLC**

51.     Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

52.     Defendant Rock Gate offered Plaintiff a $200 commission per enrollment on behalf of Rock Gate Capital.

53.     Plaintiff accepted this offer and performed by attempting to make and making such enrollments.

54.     As a result, Plaintiff entered into a valid and enforceable agreement with Rock Gate Capital, LLC requiring the payment of commissions for such enrollments.

55.     Rock Gate willfully breached the First Amended Commission Plan agreement with Plaintiff by failing to pay commissions Plaintiff earned.

56.     As a direct and proximate result of Defendant Rock Gate Capital, LLC's breach of contract, Plaintiff suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## **COUNT II**
**Violation of the Covenants of Good Faith & Fair Dealing**
**against Defendant Rock Gate Capital, LLC**

57.     Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

58.     Rock Gate purposely engaged in a course of conduct, including by refusing to pay Plaintiff amounts Rock Gate has admitted it owes, intended to prevent Plaintiff from securing the benefits of her bargain with Rock Gate.

59.     Rock Gate made efforts to retroactively apply a new, significantly lower commission plan after Plaintiff's commissions were already earned.

60.     Rock Gate's pattern and practice is to diminish Plaintiff's benefits once she begins to earn "too much."

61.     Rock Gate never had any intention of allowing Plaintiff to excel or even naturally progress in her position.

62.     Rock Gate's conduct was done in bad faith and deprived Plaintiff of the benefit of her bargain, namely, that if they made an enrollment, they would be paid a $200 commission and further amounts she would have earned.

63.     As a direct and proximate result of Rock Gate's willful conduct, Plaintiff suffered damages in the amount of the commissions, as well as other damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## COUNT III
### Unpaid Overtime and Untimely Wages in Violation of the FLSA
### against Defendants

64.     Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

65.     Under the FLSA, 29 U.S.C., § 207, "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty (40) hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

66.     At all relevant times, Defendants were employers within the meaning of the FLSA, 29 U.S.C. § 203(d), and at all relevant times had the authority to hire and fire, supervise and asserted control over scheduling and other terms and conditions of employment, determined rate and method of pay, and maintained employment records in connection with Plaintiff's employment.

67.     Specifically, at all relevant times, Rock Gate Capital CEO Steve Gold had control over the company's day-to-day operations, including the power to hire, fire, set wages, and directly supervise certain employees, including Plaintiff, both directly and indirectly through her immediate supervisor.

68.     At all relevant times, Mr. Gold was actively involved in the decisions leading to the alleged violations identified herein and had a direct role in the company's non-compliance.

69.     Plaintiff was a non-exempt employee employed by Defendants within the meaning of the FLSA, 29 U.S.C. §§ 203(e)(1) and 213(a)(1).

70. At all relevant times, Defendants were engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

71. Throughout her employment, Plaintiff regularly worked in excess of 40 hours in a given workweek. 29 U.S.C. § 207(a). On average, Plaintiff worked 5-10 hours of overtime per week.

72. Defendants failed to pay Plaintiff overtime, including one and one-half times her regular rate for hours worked over 40 hours.

73. Plaintiff's supervisors told her to clock out and continue working.

74. Defendants' conduct was willfully and knowingly in disregard of the provisions of the FLSA by the failure to compensate Plaintiff overtime despite knowledge that she was caused and permitted to work hours in excess of 40 in any given week.

75. Records, if any, concerning the number of hours worked by Plaintiff and the actual compensation paid, including documents necessary to calculate the regular rate, are in the possession and custody of Defendants and third parties. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

76. Defendants also failed to properly disclose or apprise Plaintiff of her rights under the FLSA in accordance with 29 C.F.R. § 516.4.

77. Defendants also failed to pay wages timely, oftentimes paying wages weeks or months late.

78. As a direct and proximate result of Defendants' willful disregard for the FLSA, Plaintiff is entitled to an award of damages of unpaid overtime wages and an equal amount as

liquidated damages, in addition to prejudgment interest, reasonable attorneys' fees, costs, and expenses.

<u>**COUNT IV**</u>
**Retaliation in Violation of the FMLA**
**against Defendants**

79. Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

80. At all times material to this Complaint, Defendant was engaged in commerce or its industry, which affects commerce, and was Plaintiff's "employer" within the meaning of the FMLA, with 50 or more employees on each working day in each of 20 or more calendar weeks in the current of proceeding year. 29 USC 2611 (4)(A)-(B).

81. Defendant is a national company and trains truck drivers, which are transporting goods across state lines.

82. At all times material to this Complaint, Plaintiff was an "eligible employee" within the meaning of the FMLA, having worked for the Defendant for at least 12 months and having at least 1,250 hours of service with Defendant during the previous 12 month period. 29 USC 2611(2)(A).

83. At all times material to this Complaint, Plaintiff's panic attack, anxiety, and depression disability was a "serious health condition" within the meaning of the FMLA requiring continuing treatment by his healthcare provider Dr. Mackey. 29 USC 2611(11).

84. Plaintiff's disability requires periodic visits for treatment by a healthcare provider, continues and has continued over an extended period of time, and may cause episodic rather than a continuing period of incapacity.

85. Plaintiff's continuing treatment includes mental health therapy, medication therapy, and more.

86.     These characteristics of Plaintiff's disability are the reasons intermittent leave was appropriate.

87.     Plaintiff engaged in protected activity when she requested and was approved for leave pursuant to the FMLA by her supervisor and Defendant.

88.     Defendant did not request any medical certifications or documentation in support of Plaintiff's FMLA leave.

89.     Plaintiff suffered adverse employment actions due to her invocation of rights pursuant to the FMLA, including failure to promote, failure to consider for promotion or advancement, diminution of compensation and benefits, and negative impact on work conditions.

90.     Plaintiff's supervisor directly told Plaintiff that she was not being considered for promotions because of her invocation of FMLA rights and would not be considered until she no longer utilized intermittent FMLA leave.

91.     Indeed, Defendant refused to promote Plaintiff, increase her compensation, or consider her for promotions.

92.     At all times relevant to this Complaint, Steve Gold acted directly or indirectly in the interest of Rock Gate in relation to Plaintiff.

93.     Gold controls the terms and conditions of employment of the Enrollment Specialist position, and is the ultimate decisionmaker on behalf of himself and Rock Gate.

94.     Gold sets wages, determines promotions and opportunities available to certain employees (including Plaintiff), and controls all other terms and conditions of employment.

95.     Defendants' retaliation was done in bad faith insofar as it was explicitly done due to Plaintiff invoking rights under the FMLA.

96.     As a direct and proximate result of Defendants' willful conduct, Plaintiff suffered and is entitled to compensatory damages, liquidated damages, back pay, front pay, costs, fees, and any other relief permissible under the law.

**COUNT VI**
**Violation of the Equal Pay Act**
**against Defendant Rock Gate Capital, LLC**

97.     Plaintiff incorporates the allegations in the foregoing Paragraphs as if fully stated herein.

98.     The Federal Equal Pay Act mandates that no employer shall discriminate between employees "on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . ." 29 U.S.C. 206(d).

99.     Defendants paid higher wages to males for equal work that Plaintiff performed.

100.    Moreover, Defendants refuse to consider women like Plaintiff in leadership roles which command the company's higher salaries.

101.    Those roles, such as the Enrollment Manager role, are reserved for men.

102.    Plaintiff is entitled to damages, including compensatory, actual, and punitive damages, in addition to attorneys' fees and costs, as a result of Defendants' unlawful conduct.

**COUNT VII**
**Quantum Meruit (in the alternative to Counts I-VI)**
**against Defendants**

103.    Plaintiff performed services in good faith and in reliance on Defendants' assurances, including making sales to Defendants' customers, among other services.

104.    Defendants accepted said services.

105.    There was an expectation that Plaintiff be compensated for the services performed.

106.    Plaintiff is entitled to payment for the reasonable value of the services rendered in an amount to be determined at trial.

107.    Defendants have refused to compensate Plaintiff for the work performed.

108.    Due to Defendants' willful conduct, Plaintiff is entitled to recover from Defendants any underpayment and all other damages permitted under the law, to the maximum extent.

## PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment finding in Plaintiff's favor and issue an order:

a.  Declaring that the actions complained of herein willfully violated the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*) in effect at the time of violation, that Rock Gate breached its contract with Plaintiff, and that Defendants engaged in the harm alleged herein;

b.  An award of unpaid wages at the overtime wage rate due under the FLSA § 207;

c.  An award of liquidated damages as a result of Defendant's failure to pay wages at the overtime rate pursuant to 29 U.S.C. § 216;

d.  An award of compensatory, punitive, and liquidated damages resulting from Defendants' wrongful conduct;

e.  An award of reasonable attorneys' fees, expenses, and costs of this action; and

f.  Awarding such other relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues as to which a jury trial is available.

Dated: August 27, 2025                    Respectfully submitted,

                                          **GIANNA LATORRE,**

                                          By: /s/ *Laura Luisi*
                                          Laura Luisi
                                          Jamie Holz
                                          **LUISI HOLZ LAW**
                                          LuisiL@luisiholzlaw.com
                                          HolzJ@luisiholzlaw.com

77 W. Wacker Dr., Suite 4500
Chicago, Illinois 60601
Tel: (312) 639-4478

*Attorneys for Plaintiff*

EXHIBIT A



January 12, 2022
Gianna Latorre

Dear Gianna,

Please find your bonus structure below.

- For each month, if the number of students you enroll is between:
    - 0 and 25, you will receive no bonus
    - 26 and 30, you will receive $15 per enrolled student
    - 31 and 35 you will receive $35 per enrolled student
    - 36 and 40, you will receive $55 per enrolled student
    - 41 and 45, you will receive $80 per enrolled student
    - 46 and 50, you will receive $105 per enrolled student
    - More than 50, you will receive $125 per enrolled student

- If you have a single month with 25 or fewer enrollments, the highest payment rate per enrolled student for the following month is $25, regardless of the number of students you enroll
    - For new hires, this rule is waived for the first two full calendar months following the hire day

Please acknowledge receipt of these goals by signing below and returning to Nicki Kleifield prior to your start date.

We look forward to having you join the 160 team!

*Madeline Crider*

Madeline Crider
Director of Human Resources

I acknowledge I have received my 2022 recruited enrollment goals and understand my bonuses will be calculated using the above numbers.

Signature: _____

Printed Name: _____

Date: _____

EXHIBIT B



## Enrollment Counselor Bonus Structure

We are excited for you to join our 160 Driving Academy team as an Enrollment Counselor. Your bonus structure will be as follows:

For each month, the number of students you enroll will pay out:
- $200 per enrollment


**There is no cap to your bonus earnings each month.**

Bonuses will **only** be paid for currently employed employees.


We look forward to your contributions!

Rob Dearth
Director




Please indicate your understanding of the bonus structure by signing below.



Signature ___ Gianna Latorre _____ Date ___1/17/2024___

EXHIBIT C



**To**: Remote Enrollment Counselor
**Re**: 2024 Commission Program
**Effective Date**: October 1st, 2024

---

## Remote Enrollment Counselor Student Enrollment Commissions Payout Schedule:

**Recruited Students Only:**

- Recruited students will be paid out at **$200 per student** once the payment requirements are met.
- **Recruited Refresher Program Students**: Will not count towards the enrollment payout method above. Instead, they will be paid at a flat rate of **$30**.

---

**Referred Students:**

- Referred students (e.g., Pepsi, Dollar General, FreeWorld, Amazon TOM, etc.) will be paid out at **$30 per student** (excluding Amazon CC).

**Amazon CC Students** will be paid as follows:

- **$50** for each Career Choice student once they receive a permit, start in the yard, and have completed a negative drug screen.
- **$25** for each Career Choice student once they have graduated.

---

**Payment Requirements:**

- Must be paid in full by the end of the month in which your bonus will be calculated.
- **Your name** must be in the **"enrolled by"** field.
- **Compliance**: Enrollments must comply with all state and federal laws, including paperwork.
- Student program status must be **active** (dropped, no-show, and canceled students do not count towards commission).

**Monthly Report for Commission Calculations:**

- The report is run by the **1st week of each month**.
- Review the accuracy of the data in Salesforce to avoid delays in payments.
- Ensure the following Salesforce fields are correct: date class begins, LMS total hours, enrolled by, program type, recruitment type, and payment status.
- Commissions will be calculated based on the **date class begins** field in Salesforce.

---

**Commission Payments Upon Termination:**

- Commissions are only earned while you are an employee. If your employment ends, you will earn commission **ONLY through your final date of employment**. Commissions will only be paid if they meet the payment requirements (as defined above) on or before the date of termination.

---

**Agreement Clause:**

This agreement describes the terms and conditions by which your commissions as a Remote Enrollment Counselor shall be earned and calculated and supersedes all prior written or verbal agreements, arrangements, or representations regarding your commissions.

---

**Acknowledgment:**

Please sign this form acknowledging receipt and understanding of the new program.

| | |
|---|---|
| DocuSigned by:<br>*Gianna Latorre*<br>31CA0B7EF22D4D4... | Gianna Latorre     Name<br><br>            Signature<br>10/24/2024     Date |